Donald VAUGHN, Appellant,

v.

The STATE of Texas, Appellee.

No. 58432.

Court of Criminal Appeals of Texas, Panel No. 2.

Jan. 30, 1980.

**916**

Belvin R. Harris, Gainesville, Minter & Ables, Madill, Okl., for appellant.

Jerry W. Woodlock, Dist. Atty., Gainesville, Robert Huttash, State's Atty., Austin, for the State.

Before ODOM, TOM G. DAVIS and CLINTON, JJ.

## OPINION

CLINTON, Judge.

Buster Northern was made infamous and judges became timorous[1] some thirty years ago by the backlash of *Northern v. State*, 150 Tex.Cr.R. 511, 203 S.W.2d 206 (1947).[2] Now, appealing from a conviction for the offense of murder and a life sentence, in what is surely the most audacious bit of advocacy in recent times, appellant cites and would have us follow *Northern*. We decline the invitation and today mark the previously unheralded demise of *Northern*.

This is an appeal from a conviction for the offense of murder wherein the jury assessed appellant's punishment at confinement in the Texas Department of Corrections for life.

Appellant actually presents seven grounds of error for our consideration: that the trial court erred in failing to grant his motion to quash the indictment; that the State failed to present sufficient evidence tending to prove that the State of Texas had jurisdiction over the instant offense; that there was insufficient evidence tending to show that appellant "stomped and kicked" the deceased to death as alleged in the indictment; that the testimony relating to a divorce petition and temporary restraining order between the deceased and appellant was admitted into evidence over his timely objection; that the charge of the court was at a variance with allegations contained in the indictment; that the prosecutor engaged in manifestly improper argument; and that the quantum of evidence adduced below was insufficient to support the jury verdict. For reasons more fully developed below, we overrule these contentions and affirm the judgment of conviction.

---

1. Writing in *Riley v. State*, 379 S.W.2d 79 (Tex. Cr.App.1964) Judge McDonald delicately observed "that none of the present members of this Court were members of the Court at the time of rendition" of *Northern* and *Gragg*, infra, *id.* at 81.

2. *Gragg v. State*, 148 Tex.Cr.R. 267, 186 S.W.2d 243 (1945), which caught public attention by holding that an indictment for murder by drowning must inform the accused of the particular manner and means of accomplishing the drowning, presaged *Northern*, and, when its holding was coupled with *Northern*, the synergetic impact was irresistible.

Teresa Vaughn, wife of appellant, punched the time clock to leave the Hilltop Cafe where she worked as a waitress at 11:09 p. m. on the evening of August 9, 1976. While she was working, however, one Marilyn Sollers testified that she and appellant parked across IH–35 from the cafe at approximately 10:30 p. m., ostensibly to watch appellant's wife.[3] Appellant and Sollers were, at that time, driving a maroon Ford with a black vinyl top. The situs of these and immediately subsequent events is Cooke County.

When his wife exited from the cafe at or about 11:00 p. m., appellant told Sollers that he wanted to hurry back to Sollers' house, pick up his children and attempt to beat his wife home so that the latter would not know that she had been spied on.

Michael Jay Nail, nine year old son of appellant's wife, recounted that he remembered the night his mother was hurt in the dining room of the family home in Gainesville. He at first testified that he had been in the dining room when his mother was hurt but quickly corrected himself and noted that he had been in bed at that time. The child testified that he, his mother, his two sisters and appellant headed to the hospital at the behest of appellant but that they never made it as the police stopped them in Ardmore, Oklahoma.

The mother of appellant's wife testified that prior to their separation, her daughter and appellant were living together in Gainesville, Cooke County, but that they had in fact been living apart for some time.

State's witness James Mayes testified that he left for work from his home 5½ miles south of nearby Marietta, Oklahoma, some five or ten minutes after midnight in the early morning hours of August 10, or approximately one hour after Teresa Vaughn punched out of work. Mayes drove north en route to Marietta where he recalled seeing an automobile parked partially on the highway. He proceeded on to Marietta where he hailed Officer Jack Caldwell and informed the latter of what he had

seen. The two men observed the vehicle pass by them as they were talking and subsequently followed and eventually detained the vehicle. Mayes noted that after the vehicle slowed to a halt, appellant got out and Caldwell then motioned him to wait between the two vehicles.

Mayes and Caldwell approached appellant's vehicle, an Oldsmobile, and observed the body of Teresa Vaughn slumped over in the right floorboard of the vehicle. Upon seeing the two men observe the body of his wife, appellant fled the scene but not before he told Caldwell that "his wife was in the front seat passed out, that she had–got drunk and fell and hit a chair and hurt herself," and that appellant "was taking her home to put her to bed." Appellant also told Caldwell, in response to the latter's suggestion, that the woman obviously needed medical attention [both Caldwell and Mayes remembered seeing blood on the seat], "that she woke up back down the road, she was okay, and she woke up down the road and talked to him [appellant]."

After appellant disappeared from the scene, Caldwell examined appellant's wife and could not feel any pulse. He then radioed the Ardmore Police Department to request an ambulance and the County Coroner, Dr. O'Conner. The children in the vehicle were taken to a childrens shelter in Ardmore by a park ranger.

Dr. O'Conner testified that he performed an autopsy on Teresa Vaughn and was of the opinion that the cause of her death was "hemorrhage secondary to ruptured organs due to being stomped and kicked." He reported that the victim's hair was bloody, that blood was running out of the left side of her mouth, that her jaw was broken, that one of her fingernails was torn off in what appeared to be a defensive wound, that she had severe bruises and marks about her face, jaw, and corners of her eye, and finally, that there appeared to be a round heel mark on her chest.

---

**3.** They also observed her parked car which, though we have not been directed to any record reference for it, all seem to agree was an Oldsmobile automobile.

Chief Medical Examiner of the State of Oklahoma, Dr. A. Jay Chapman, corroborated Dr. O'Conner's testimony, noting that the injuries he found during the autopsy were consistent with the victim having been stomped and kicked and that a crescentic mark on the skin overlaying the spleen was consistent with a heel mark.

Investigator Wayne Warthen from the District Attorney's Office of the 20th Judicial District of the State of Oklahoma, along with other officers, returned to the victim's house in Gainesville and found a maroon Ford with a black vinyl top parked in front of the residence. Upon entering the house, they discovered the air conditioner running, two overturned chairs in the dining room and what appeared to be, and was later proven to be, spots of human blood on the linoleum in that same area.

Don King, one of the officers who had accompanied Warthen, recounted that the door to the victim's residence was ajar, a noisy air conditioner was running and a large black cat was crouched in the dining area licking what he thought was blood. He noted the presence of scuff marks on the linoleum floor in the dining room area which appeared to be the work of a rubber heel from a shoe or boot and which were adjacent to the overturned dining room chair.

Marylu Sampson, a neighbor of appellant's brother, testified that two days before Teresa Vaughn's death, she overheard appellant tell his sister–in–law that "he was going to kill Teresa when I found her and they laughed at me but I will show them I will kill the bitch when I find her." She further recounted that she had overheard appellant tell his sister–in–law that she might have to raise his baby. The State then rested its case–in–chief.

Appellant called several witnesses who testified generally that the deceased had been unfaithful to appellant and that the drive from Marilyn Sollers' residence to the victim's residence would have taken at least ten minutes.

In rebuttal, the State called attorney Harold Freeman who testified that the deceased had retained him so that she could file for divorce and that he had in fact filed such a petition as well as a temporary restraining order. Finally, the State presented evidence that the route from the Sollers' residence to the victim's residence could be traversed in lunch hour traffic in two and a half minutes and that the route from the cafe where the deceased worked to her house could be traveled in either seven and a half minutes or slightly over eight minutes depending on the route one took during lunch hour traffic.

◼ In ground of error number one, appellant contends that the trial court erred in failing to grant his timely motion to quash the instant indictment in that it fails adequately to allege the manner and means by which the offense was committed. Omitting the formal parts, the indictment alleged that appellant:

"... [d]id then and there intentionally and knowingly cause the death of ... Teresa Vaughn, by kicking the said Teresa Vaughn with his feet and by stomping the said Teresa Vaughn with his feet..."

The thrust of appellant's contention is that this indictment must fall inasmuch as it fails to allege that appellant effected the kicking and stomping *with shoes on his feet* and that the lack of such an averment somehow prejudiced him, given the fact that there was evidence of such footwear in the record. In support of this contention, appellant relies upon *Northern v. State*, supra. *Northern* was tried on an indictment similar to the one at bar in that it alleged that the accused killed the deceased by "kicking and stomping" her. In finding that the indictment was fatally defective, a majority of the Court, over the vigorous dissent of the minority, held that the indictment failed to charge the means employed in the commission of the crime. *Id.* 203 S.W.2d at 207. The Court pointed out in passing and it appears *as a matter of dicta*, that:

"It would have been an easy matter to have alleged in the indictment that the accused stomped the deceased to death with his feet with shoes on since the

grand jury had that information when the indictment was drawn."

*Id.* 203 S.W.2d at 207.

At the outset, we observe that, unlike the indictment in *Northern*, the instant indictment did allege that the crime was effected by appellant having kicked and stomped the deceased to death *with his feet*. The conception that an indictment, alleging an offense peculiar to the one at bar and in *Northern*, aver that the kicking and stomping with the feet include the magic words "with shoes on" is, as noted above, a matter of dicta and not of precedent. There is also no showing in the record, none to which we are directed, that the grand jury was aware of how his feet were shod at the time of the killing. To have alleged that the kicking and stomping was effected with boots or shoes or whatever would have placed a well–nigh impossible burden on the State, in this circumstantial evidence case. The manner, kicking and stomping, and the means, with his feet, are plainly set forth. Thus, the indictment is not such as to deprive appellant the right of pleading the judgment in this case as a bar to any future prosecutions hereunder or to deny him adequate notice, so that appellant, accordingly, was not prejudiced to his detriment thereby. See *Benoit v. State*, 561 S.W.2d 810 (Tex.Cr.App.1977).

There comes the matter then of the applicability of the holding of *Northern*, supra, to the case before us, and whether *Northern* can in any manner be construed as requiring reversal herein. *Northern's* worth as precedent has been seriously undermined since it has neither been cited as authority nor in any other way reaffirmed by this Court, but has instead apparently been abandoned in favor of the holdings in *Grady v. State*, 150 Tex.Cr.R. 331, 200 S.W.2d 1017 (1947) and *Borski v. State*, 154 Tex.Cr.R. 84, 225 S.W.2d 180 (1948). See *Alobaidi v. State*, 433 S.W.2d 440, 442–43 (Tex.Cr.App.1968). Under these circumstances, then, given *Northern's* manifest lack of vitality as authority of any kind, it appears that *Northern* has in fact been overruled *sub silentio*, thereby obviating any further need to overrule it expressly. See also *Riley v. State*, 379 S.W.2d 79, 80–81 (Tex.Cr.App.1964) (McDonald, J., concurring). Appellant's first ground of error is overruled.

In ground of error number two, complaint is made that the State failed to present sufficient evidence tending to prove jurisdiction in the State of Texas over the instant offense, consistent with the dictates of V.T.C.A. Penal Code, § 1.04, *et seq.* The thrust of this contention is appellant's bald assertion that "a review of the complete Statement of Facts in this case clearly negatives any jurisdictional facts." We do not agree.

V.T.C.A. Penal Code, § 1.04, supra, provides in pertinent part:

"(a) This state has jurisdiction over an offense that a person commits by his own conduct or the conduct of another for which he is criminally responsible if:

(1) either the conduct or a result that is an element of the offense occurs inside this state;

\*     \*     \*     \*     \*     \*

(b) If the offense is criminal homicide, a 'result' is either the physical impact causing death or the death itself."

Viewing the evidence in the light most favorable to the jury verdict below, notwithstanding the circumstantial nature of such evidence, *Jackson v. State*, 548 S.W.2d 685 (Tex.Cr.App.1977), we believe the jury could have reasonably concluded that the deceased was in fact either trampled nearly to death or actually killed in the State of Texas, to wit: Cooke County. The victim's son testified that his mother "was hurt in the dining room" of her residence in Gainesville; there were overturned chairs and human blood found in the dining room area of the residence; the air conditioner had been left running and the front door of the residence was left ajar. Additionally, Dr. Chapman, the medical examiner from Oklahoma, testified that in his opinion, an individual who had received the injuries inflicted upon the deceased could not have

lived more than ten minutes after receiving such injuries. We believe that jurisdiction, like any other requisite of an offense, can be proven circumstantially and that our holding herein is consistent with the disposition of those cases where the State is compelled to prove up venue in a circumstantial manner. See, e. g., *Edwards v. State*, 427 S.W.2d 629 (Tex.Cr.App.1968). As noted above, the jury could have, and by its verdict did, reasonably conclude that the instant offense, i. e., the physical impact causing death or the death of the deceased itself, occurred in Cooke County, in the State of Texas. Appellant's second ground of error is overruled.

In grounds of error three and seven, appellant challenges the sufficiency of the evidence to sustain the verdict below, particularly the purported lack of evidence tending to show that Teresa Vaughn was stomped and kicked by appellant.

■ Though we will not traverse that ground covered in the statement of the facts of this cause, ante, we will note again at this juncture that we are constrained to review the sufficiency of the evidence below in the light most favorable to the jury verdict. *Jackson v. State*, supra. Indeed as this Court noted in some detail in *Parker v. State*, 432 S.W.2d 526 (Tex.Cr.App.1968):

"While this court has the right to reverse a judgment of conviction on account of the insufficiency of the evidence and it becomes its duty to do so 'if the guilt of the accused is not made to appear with reasonable certainty' [cites omitted], no fixed rule has been devised which will in all cases furnish a certain standard. Necessarily each case must in a measure be tested by its own facts [cites omitted]. However, when a jury, advised of the restrictions which the law places upon them in condemning one on circumstantial evidence, reaches the conclusion upon evidence properly before them that the

accused is guilty, *it is not for the reviewing court to supplant their findings by its own, unless it is able to point to weaknesses, omissions, or inconsistencies in the evidence which destroy its cogency.*" [4]

*Id.* at 531, quoting *Taylor v. State*, 87 Tex. Cr.R. 330, 221 S.W. 611, 613–14 (1919).

■ The State's evidence consisted of, *inter alia*, appellant's threat to take the life of the deceased several days before the latter was killed; appellant's repeated surveillance of his wife hours before her death; Michael Nail's testimony that his mother was hurt in the dining room as well as the crime scene discovered by investigators; appellant's fabrication that his wife had fallen down when she was drunk and that he was first taking her home, only to change that story to taking her to the hospital; appellant's flight when officers discovered his wife's body; and, last but not least, the medical testimony finding that the cause of death was, as the State alleged, due to kicking and stomping and the resultant hemorrhaging from vital organs injured thereby. Appellant argues that there was no evidence tending to show that the deceased was kicked and stomped by him. The circumstantial evidence adduced below belies that contention. There was testimony that the victim's body contained a heel print in the center of her chest as well as a crescentic–shaped mark on the deceased's rib cage, which again was consistent with a heel mark; that, in turn was consistent with that evidence at the crime scene, namely scuff marks from a rubber heel and the disarray of the dining area replete with blood spots. That and medical testimony are sufficient to show that deceased died from injuries caused by kicking and stomping with feet–shod with footwear–and, with other evidence, by the feet of appellant.

■ It is of course axiomatic that the cause of death in a homicide prosecution may be established by circumstantial evi-

---

**4.** All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

dence, *Madden v. State*, 171 Tex.Cr.R. 80, 344 S.W.2d 690 (1961), but that a conviction based on such circumstantial evidence cannot be sustained if the circumstances do not exclude every reasonable hypothesis except that of the guilt of the accused, and proof amounting to only a strong suspicion or mere probability is insufficient. *Easley v. State*, 564 S.W.2d 742 (Tex.Cr.App.1978). But it is not necessary, however, that every fact point directly and independently to the guilt of the accused, and the cumulative force of all the incriminating circumstances may be sufficient to warrant a conclusion of guilt. *Sullivan v. State*, 564 S.W.2d 698 (Tex.Cr.App.1978) (on motion for rehearing). It is not required that the circumstances should to a moral certainty actually exclude every hypothesis that the act may have been committed by another person, but the hypothesis intended is a reasonable one consistent with the facts proved and the circumstances, and the supposition that the act may have been committed by another person must not be out of harmony with the evidence. *Flores v. State*, 551 S.W.2d 364 (Tex.Cr.App.1977).

We find the cumulative force of all the incriminating circumstances sufficient for the jury, as the trier of fact in this case, to conclude, as they did, that appellant was guilty beyond a reasonable doubt of the offense with which he was charged. See *Easley v. State*, supra; *Sullivan v. State*, supra; *Stogsdill v. State*, 552 S.W.2d 481 (Tex.Cr.App.1977); *Flores v. State*, supra. Appellant's third and seventh grounds of error are overruled.

■ In ground of error number four, appellant advances the contention that the trial court erred in admitting the testimony of attorney Harold Freeman concerning the fact that the deceased had filed for divorce and asked for a temporary restraining order from appellant.

The record reflects that Freeman was called as a rebuttal witness for the State after appellant had presented several witnesses who testified that the deceased had been "running around" on appellant and who testified generally as to her lack of moral character. Over appellant's timely objection, Freeman was permitted to testify that in December 1978 the deceased had retained him for the purpose of filing a divorce petition against appellant, and on the day before her death, to seek a temporary restraining order, and that he had done so. Appellant relies on *Erwin v. State*, 531 S.W.2d 337 (Tex.Cr.App.1976) for the proposition that *any* testimony relating to domestic relations pleadings is by definition hearsay and objectionable. *Erwin* does not cast that broad a net, however; reversal was warranted in that cause because the prosecutor actually read into the record the divorce petition, masking it as impeaching the testifying accused. The petition by accused alleged, *inter alia*, threats and harassment towards the deceased, his violent temper, her fear of bodily injury at his hands recounting an incident where the accused ran her car off the road at eighty miles per hour. The prejudicial effect of such hearsay allegations before the jury in *Erwin* was clear. In the instant case, Freeman's testimony related solely to the filing of a divorce petition and did not at any time report the allegations therein. The suitable purpose of such testimony was to show something of the feelings and relations of the parties and was a legitimate attempt to rebut appellant's evidence that the deceased was being unfaithful to appellant and was generally a bad person. The divorce petition was not introduced into evidence and, as noted above, nothing from the instrument itself ever reached the jury. The State seems to have been guided here by *Lawrence v. State*, 112 Tex.Cr.R. 659, 18 S.W.2d 181 (1928), particularly as it comprehended *Pinckord v. State*, 13 Tex.App. 468. On this basis, we believe that *Erwin* is readily distinguishable and in no way supports appellant's argument herein. Appellant's fourth ground of error is overruled.

In his fifth ground of error, appellant advances the contention that while the in-

dictment alleged that he "stomped *and* kicked" the deceased to death, that the charge to the jury authorized conviction if they found that appellant "stomped *or* kicked" the deceased to death. Such a charge, reasons appellant, is obviously at a variance with the indictment and is fatal. This contention is without merit.

The only objection appellant voiced to the charge submitted was "for the same reasons stated in *our motion for directed verdict.*" That remark ignores the mandate of Article 36.14, V.A.C.C.P., that objections be made either in writing or dictated to the court reporter "distinctly specifying each ground of objection." Absent a specific objection to the jury charge in the disjunctive regarding the manner of commission of the offense, *nothing is preserved for review.* See *Singleton v. State*, 543 S.W.2d 138 (Tex.Cr.App.1976). Moreover, since the evidence below tended to show and the jury could have reasonably concluded that the deceased was kicked *and* stomped by appellant during a single transaction, it was not error for the court to charge in the disjunctive regarding the means of commission of the offense. *Brantley v. State*, 522 S.W.2d 519, 525 (Tex. Cr.App.1975). Appellant's fifth ground of error is overruled.

In ground of error number six, appellant contends that the prosecutor engaged in manifestly improper argument during the offense stage of the trial. The complained of argument occurred as the prosecutor was recounting the testimony of Michael Nail, the nine year old son of the deceased, and the latter's purported reason for having cried on the witness stand after being sworn:

"THE PROSECUTOR: Mike also, in his testimony when I first asked him where he was when his mother was hurt, he said in the dining room. Then he said, 'I mean in the bedroom.' Now, taking all that into consideration, which you can do as the trier of the facts in this case, *isn't it a reasonable deduction from the evi-*

*dence that you heard from that witness stand, that why that little boy was scared to come in here, why that little boy got up on that witness stand and cried, is because he was seeing the man that he had seen stomp his mother to death, and he was afraid to tell you about it because he saw him* sitting right there. (Indicating)

Appellant's motion for a mistrial was overruled though the record reflects that no objection as such was made nor an instruction to disregard requested.

The thrust of appellant's contention is that the complained of argument introduced new and harmful facts into the record as well as the unsworn testimony of the prosecutor that the witness had in fact seen appellant stomp his mother to death and was afraid to tell the jury about it. The State counters with the two-fold argument that error if any was not properly preserved given the lack of an objection and an instruction to disregard and that the argument itself was merely a reasonable deduction from the evidence.

The record reflects that the Nail boy testified he did not see his mother get hurt, and, when asked where he was, the witness at first replied that he was in the dining room, but immediately corrected himself and said he was in bed; he then testified she got hurt in the dining room. Wayne Warthen, the criminal investigator from Oklahoma, testified without objection that Nail had told him he had been awake when his mother was hurt. It is evident that the boy began crying on the witness stand after he was sworn and it is reasonable to assume from attempts to make the witness feel at ease that the latter was visibly shaken.

This Court has consistently held that counsel may during final argument draw from those facts in evidence all inferences that are reasonable, fair, and legitimate and that he has wide latitude without limitation in this respect so long as the argument is supported by the evidence and

offered in good faith. *Antwine v. State*, 572 S.W.2d 541 (Tex.Cr.App.1978); *Wyatt v. State*, 566 S.W.2d 597 (Tex.Cr.App.1978); *Griffin v. State*, 554 S.W.2d 688 (Tex.Cr. App.1977). Such inferences may be based upon what the jury *heard and observed* in the courtroom during the presentation of evidence. *Antwine v. State*, supra, at 544. Though the question is close, considering that the jury, itself, observed the conduct of the Nail boy as it listened to his testimony, and thus each juror was fully capable of drawing whatever deduction from both that was deemed reasonable, including one different from that drawn by the prosecutor, we cannot comfortably conclude from the cold record there was error in failing to grant a mistrial—the sole relief requested.

Failure to move for an instruction to disregard vitiated any possibility that the trial court could have cured any error at that juncture. The argument was not clearly calculated to inflame the minds of the jury so as to suggest the improbability of withdrawing whatever impression it created in their minds had a prompt instruction to disregard been requested. See *Cavender v. State*, 547 S.W.2d 601 (Tex.Cr.App.1977); *Broussard v. State*, 505 S.W.2d 282 (Tex.Cr. App.1974); *Washington v. State*, 484 S.W.2d 721 (Tex.Cr.App.1972) (remark made during voir dire and no instruction to disregard sought). Appellant's sixth ground of error is overruled.

The judgment is affirmed.