**AFFIRM, and Opinion Filed April 30, 2013.**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-11-01659-CR**
**No. 05-11-01660-CR**
**No. 05-11-01661-CR**
**No. 05-11-01662-CR**

**RONALD WAYNE LIGHTNER, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 195th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause Nos. F10-11165-N, F-1011166-N, F-1025163-N, F-1059447-N**

## MEMORANDUM OPINION

Before Justices Bridges, O'Neill, and Murphy
Opinion by Justice Bridges

Appellant Ronald Wayne Lightner appeals his three aggravated robbery with a deadly weapon convictions (Nos. 05-11-01659-CR, 05-11-01660-CR, and 05-11-01661-CR) and his accompanying sentence of life in prison. Appellant further appeals his conviction for evading arrest/detention by motor vehicle (No. 05-11-01662-CR) and his resulting sentence of 20 years' imprisonment with a fine of $10,000. In seven issues, appellant argues the trial court erred by: (1) overruling his objection to James Rogers being allowed to testify as an expert witness; (2) denying his pretrial motion to suppress; (3 & 4) overruling his objection to the State's propounded questions asking for hearsay evidence; (5) overruling his objection to the State's jury argument during the guilt/innocence stage of trial; (6) overruling his objection to the State's

cross-examination of his punishment phase witness; and (7) overruling his objection to the State's jury argument during the punishment phase of trial. We affirm.

## BACKGROUND

### A. *Aggravated Robbery of Kaitlyn Staffieri and Matthew Austin (Appellate Cause Nos. 05-11-01659-CR and 05-11-01660-CR)*

Kaitlyn Staffieri testified that, on August 7, 2010, she and her boyfriend, Matthew Austin, were staying at her friend's house in Addison. When they arrived at Ginny Hubbard's house between midnight and 1:00 a.m., Hubbard was still at a movie. Staffieri immediately went to the bathroom, and Austin took the dog outside. When she came out of the restroom, she saw Austin and a man she did not know walking into the apartment. The man was holding a gun to the side of Austin's head, and Austin appeared terrified. She described the man as a black man with dark, bloodshot eyes, who was taller than Austin. Staffieri explained she could see the man's face, because nothing was covering it.

The man told them to get into the bathroom and then shut the door behind them. While they were in the bathroom, Staffieri and Austin used their cell phones to text their friend, Hubbard, and told Hubbard to call the police. At trial, Staffieri identified appellant as the man with the gun.

Staffieri said she heard appellant rummaging around the apartment. Appellant asked her for her PIN number and asked them where they kept the guns. Staffieri gave appellant her PIN number, but told him they did not have any guns. She estimated they were in the bathroom for 30-40 minutes. She and Austin came out of the bathroom when the police arrived. Staffieri indicated cash had been taken from her purse and her backpack, containing overnight clothes, makeup, and a hair straightener, were also taken.

Staffieri wrote a statement for the police at the scene. In the statement, she said the man was black and wore a red shirt. Several days after the incident, she met with Detective Holland at Hubbard's apartment. At that time, Detective Holland showed her a photo lineup from which she identified appellant as the man who robbed them.

2

Matthew Austin testified he and his girlfriend, Staffieri, arrived at Hubbard's house between midnight and 1:00 a.m. When Staffieri went inside to use the bathroom, Austin took the dog outside. While Austin was outside with the dog, a man with a pistol approached him. Austin described the man as "thin with a weak chin and bugging eyes." The man pointed the gun at Austin's upper torso and asked for Austin's money. Austin showed him his wallet and that he did not have any money. The man then told him to get inside and go into the bathroom. When Austin entered the house, he saw Staffieri coming out of the bathroom and told her to get in the bathroom.

Austin and Staffieri stayed in the bathroom for 30-45 minutes and were texting almost the entire time. The man asked for Staffieri's PIN number and for anything of value, including guns. They spoke with the police at the scene.

A few days later, Austin was shown a photo lineup from which he recognized the suspect. He was unable to identify appellant at trial as the person who robbed him.

Ginny Hubbard testified that, on April 7, 2010, she received a text from Staffieri, indicating there was a man in her house with a gun and that Staffieri and Austin were locked in the bathroom. When she received the message, Hubbard ran out of the movie theater and called 911. She met with the police at a park around the corner from her apartment. When she went back inside her apartment, she found her belongings thrown around and her jewelry box empty. She worked for Fossil and had a collection of 50-100 watches that had been taken. A laptop, silver platters, and flatware were also stolen. She estimated the value of the items taken to be between $3,000 to $7,000. The police dusted her apartment for fingerprints that night. She later recovered some of her possessions.

Officer Reinhardt of the Addison Police Department testified that he responded to a home invasion call on August 7, 2010. Officer Peach also responded to the call. Reinhardt testified that as he and Peach were standing at the perimeter of the crime scene, he saw a vehicle back up behind him and leave. He did not pursue the vehicle, because he did not want to leave Peach

3

alone. He notified dispatch of the vehicle, which he thought was a dark Chrysler 300 with a letter "B" on the license plate.

Officer Prehoda of the Addison Police Department testified she was dispatched to an aggravated robbery call. She arrived at the apartment complex at approximately 1:30 a.m. and was the first to arrive. She waited for the other officers to arrive to establish the perimeter. When the officers arrived, she and three other officers entered the house and cleared it. The apartment appeared to have been ransacked, and Austin and Staffieri appeared shaken. She interviewed the witnesses as the crime scene unit processed the house. Austin described the suspect as a black male in his mid-to-early thirties with a small build, clean-shaven, short hair, and bugging eyes, wearing a red shirt with a blue stripe across the chest and dark-colored shorts.

Officer Holland of the Addison Police Department testified he met with Staffieri and Austin a few days later to show them a photo lineup. He first showed the lineup to Staffieri, who identified one of the persons in the lineup as the man who robbed them. After identifying the man, Staffieri signed the back of the photograph. Holland separately showed the lineup to Austin, who also recognized a man and signed the back of the photograph.

**B.** *Aggravated Robbery of David Malcomb (Appellate Cause No. 05-11-01661-CR)*

David Malcomb testified that, on August 12, 2010, he and his girlfriend were living with his sister, Melissa, and her infant son in Garland. At approximately 1:00 a.m., the baby awakened Malcomb and his girlfriend, Nichole Frazho, and they stepped outside the apartment to smoke a cigarette. While they were outside, a man with a gun approached, pointed the gun at Malcomb, and asked if he had any money. The man directed Malcomb and Frazho into the apartment. Once inside, Frazho grabbed the baby from the crib. Malcomb told Melissa, who was making a bottle, that the man had a gun.

They all went into the bathroom and heard the man rummaging through the apartment. The man then told Malcomb to come out and help him disconnect the Xbox, so he could take it with him. Malcomb complied and then was forced back into the bathroom.

4

When the apartment was quiet, they came out of the bathroom; the man had cut the phone lines and taken their cell phones. Malcomb ran to the neighbors and asked them to call 911. Malcomb said the man had taken all of the electronics (including the Xbox, the laptop, the cellular phones) and everybody's wallets. When the police arrived, they took Malcomb's statement and dusted for fingerprints, particularly on the Xbox container.[1] Malcomb was unable to give a description of the man, because all he could remember was the semi-automatic gun.

Melissa Malcomb testified that, on August 12, 2010, she was making a bottle for her son at about 1:00 a.m. When her brother came back inside, a man was pointing a gun at him and he looked terrified. Malcomb told her the man had a gun. The man pointed the silver and black gun at her and her baby and told them to get into the bathroom. She said they locked the door and Malcomb and Frazho surrounded her and the baby to protect them. Melissa said she told the man where her valuables were, so he would leave them alone. At one point, the man called her brother out of the bathroom. She heard shuffling and feared something was happening to her brother. Malcomb, however, returned to the bathroom after about 15 minutes. She estimated they were in the bathroom approximately 30-40 minutes.

When the apartment became quiet, they exited the bathroom. The phone line had been cut and the man had taken their cell phones, so Malcomb went to a neighbor's apartment to call the police. She spoke with the police, but was unable to give them a description of the man because she was so frightened. Melissa could only recall that the man was black.

Nichole Frazho testified that, on August 12, 2010, she was outside with Malcomb, smoking a cigarette. She said a man walked past them and then returned, pointing a silver and black gun at them. The man told her to get against the wall and to give him their money. The man then told them to get inside the apartment. Once inside, she told Melissa to get in the bathroom and grabbed the baby from the crib. She then heard rummaging through the apartment and was scared when the man called Malcomb out of the bathroom. When it became quiet, they

---

[1] Malcomb testified he had placed the Xbox inside its box, but the man had removed the Xbox from its container before he left.

5

came out of the bathroom to a messy apartment. Their wallets were gone. Melissa's jewelry boxes had been dumped onto her bed. She and Malcomb then tried to find a neighbor to call the police.

When the police arrived, she made a statement to the police. She described the man as a black man, who was a little shorter than she,[2] with short hair and eyes that looked scared. The officers then dusted the apartment for fingerprints. She later met with the police for a photo lineup, but she was unable to identify the suspect in any of the photographs.

Officer Wise of the Garland Police Department testified that, on August 12, 2010, he received a call regarding a home invasion around 1:00 a.m. He described the victims as shaken and said Melissa had indicated she was separated from her baby during the robbery. Wise said the suspect was described as a black make, wearing dark clothing, and carrying a black gun with a chrome slide. He called the forensic investigators to the scene and cordoned off the area until the investigators arrived.

Karen Tucker, a forensic investigator with the Garland Police Department, testified she photographed the apartment when she arrived at the scene. She processed the scene for fingerprints and the only prints she was able to remove were from the Xbox container (State's Exhibit 14).

James Rogers, a senior prints investigator with the Garland Police Department, testified he had been working as a senior print investigator for a little over 18 years. Rogers explained that appellant's prints were taken the day before in the courtroom (State's Exhibit 16) and compared to State's Exhibit 14. Rogers testified that, based on 14 points of comparison, he was confident appellant's right thumb print matched the latent crime-scene print in State's Exhibit 14. He further explained "there is no identical fingerprint between two people in the world." Rogers agreed he could not determine the age of a latent print and that he did not receive any prints of the homeowners to eliminate them as potential candidates for the latent print.

---

[2] Frazho testified she was 5 foot, 8 inches tall.

Detective Hale of the Garland Police Department testified a thumb print was found at the scene that matched appellant's print. Hale obtained an arrest warrant and released the license plate number on the suspect's vehicle. A few days later, he learned appellant had been arrested and obtained a search warrant for rooms 118 and 119 at the Deluxe Inn, which had been rented by appellant. Inside room 118, Hale found numerous stolen items, including laptops, jewelry, and Malcomb's cell phone. He also found a black and silver 9 millimeter semi-automatic handgun. Hale said he had been told a large amount of silver flatware, a bracelet, and several other items were also found inside appellant's vehicle.

## C.   *Evading Arrest/Detention by Motor Vehicle (Appellate Cause No. 05-11-01662-CR)*

Detective Brown with the auto theft unit of the Dallas Police Department testified that he was running license plates in a Deluxe Inn parking lot when they found a gray-silver Chrysler 300, a suspect vehicle from Garland. After learning the vehicle was involved in an aggravated robbery, Brown took up surveillance on the vehicle. When the vehicle started moving, he called in marked police units to take over the arrest. Brown returned to the Deluxe Inn and learned that the person registered there was appellant.

Officer Massey of the Dallas Police Department testified that, on August 16, 2010, he and his partner, Officer Ball, responded to a call concerning a vehicle wanted in some robberies. They and other patrol vehicles followed the vehicle for two or three miles until the vehicle turned into a gas station. The officers attempted to arrest the suspect. The occupant of the vehicle opened the door, then shut the car door and accelerated. The officers pursued the vehicle, saw other vehicles spin out, and lost sight of the vehicle. They soon found the suspect vehicle (the Chrysler 300) had been involved in another accident at I-35 and Riverfront. At least three cars were involved in the accident, including the suspect vehicle. No one was inside the Chrysler 300 when the officers arrived, but bystanders pointed to the male suspect, who was leaning against a car that was not involved in the accident. Officer Massey, Officer Ball, and Officer Person arrested appellant. Massey explained numerous people were transported to the hospital due to the accident. He also identified appellant as the person he arrested that day.

Officer Ball of the Dallas Police Department was driving with Officer Massey when they responded to the call on August 16, 2010. Ball explained they were in a marked car and wearing police uniforms. Ball said the suspect male exited the car at the gas station, but then got back in the car and fled at a high rate of speed. The police had given the suspect verbal commands to stop. A passenger had jumped out of the vehicle before the suspect fled. Ball identified appellant as the driver of the suspect vehicle.

When in pursuit, the officers had to make their way through three wrecked cars until they found the suspect vehicle, wrecked at I-35 and Riverfront. There were at least four cars involved in the second accident. The suspect male had exited the Chrysler 300, but bystanders pointed out the driver. Ball testified he recognized the suspect from the gas station parking lot, and the officers arrested appellant.

Officer Person of the Dallas Police Department testified that, when she arrived at the accident scene at Riverfront, she found a major accident with four to six cars and at least six people with major injuries. She saw Massey and Ball running toward her and pointing out the suspect. She then assisted in the arrest and searched the Chrysler 300.

### D.    *Verdict and Punishment Phase*

The jury found appellant guilty of aggravated robbery in Cause Nos. 05-11-01659-CR, 05-11-01660-CR, and 05-11-01661-CR and evading arrest/detention by motor vehicle in Cause No. 05-11-01662-CR. During the punishment phase of trial, the State offered enhancement paragraphs for appellant's two prior felony convictions: (1) a 1988 conviction for aggravated robbery and (2) a 1979 conviction for burglary of a building. Appellant pleaded true to both enhancement paragraphs.

Following the testimony of additional witnesses and both attorneys' closing arguments, the jury assessed appellant's punishment at life in prison for the aggravated robbery convictions and 20 years' imprisonment, along with a $10,000 fine, for the evading arrest/detention by motor vehicle conviction.

8

# ANALYSIS

## A.  *Expert Witness Testimony*

In his first issue, appellant contends the trial court erred in overruling appellant's objection to James Rogers being allowed to testify as an expert witness on the subject of fingerprint comparison. He appears to challenge Rogers's qualifications and the reliability of his testimony. He also states the trial court abused its discretion by "denying his request to test these non qualifications in a sub rosa hearing." The trial court conducted a hearing prior to voir dire of the jury in which Rogers testified regarding his qualifications and the method for examining fingerprints. At the end of the testimony, appellant's counsel objected based on Rogers's "lax" training and lack of "knowledge of any scientific method." The trial court overruled appellant's objections. We therefore address the issue as to qualifications and reliability.

## 1.  *Standard of Review*

We review a trial court's decision to permit a witness to testify as an expert under the abuse of discretion standard. *Sexton v. State*, 93 S.W.3d 96, 99 (Tex. Crim. App. 2002); *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000). If the trial court's decision is within the zone of reasonable disagreement, its decision should be upheld. *Sexton*, 93 S.W.3d at 99.

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702. These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance. *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006). Only the first two conditions are at issue in this case, and we consider each in turn.

## 2.  *Qualification*

Qualification is a two-step inquiry: a witness must first have a sufficient background in a particular field, but a trial judge must then determine whether that background "goes to the very matter on which [the witness] is to give an opinion." *Vela*, 209 S.W.3d at 131 (citing *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996)).

9

During the sub rosa examination, Rogers testified he was a senior forensic investigator with the Garland Police Department and had been a forensic investigator for 18 years. He received training from "numerous schools with the FBI, DPS, DEA, and several private training organizations." He had testified in court as a fingerprint expert more than 10 times. He explained he had training in fingerprint comparison and advanced latent fingerprint comparison, including print processing and print gathering through DPS. He received his State AFIS (Automated Fingerprint Identification System) certification in 1994 and then his DEA certification to examine fingerprints in 2005. He had been doing fingerprint comparison for the Garland Police Department for 17 years. Based on the foregoing, we conclude the trial court did not err in overruling appellant's objection based on Rogers's qualification to testify as an expert on fingerprints. *See Vela*, 209 S.W.3d at 131-33.

*3.    Reliability*

To be considered reliable, evidence derived from a scientific theory must satisfy three criteria: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question. *Kelly v. State,* 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). This three-criteria test is not limited to novel scientific evidence; it applies to all scientific evidence. *Hartman v. State,* 946 S.W.2d 60, 63 (Tex. Crim. App. 1997). The proponent of the scientific evidence has the burden to prove its reliability by clear and convincing evidence. *Kelly,* 824 S.W.2d at 573.

However, if the Court of Criminal Appeals, this Court, or another Texas appellate court has already determined the validity of a particular scientific theory or technique, then the party offering the expert testimony need not satisfy *Kelly's* first two criteria. *Holmes v. State,* 135 S.W.3d 178, 186 (Tex. App.–Waco 2004) (citing *Hernandez v. State*, 116 S.W.3d 26, 27 (Tex. Crim. App. 2003)). The trial court and a reviewing court can rely upon prior opinions and take judicial notice of those findings. *See id.* at 31, n. 12. The uniqueness of fingerprints is one such example of a matter of common knowledge upon which we may take judicial notice. *See Holmes,* 135 S.W.3d at 189. Thus, the State was not required to present evidence regarding the

first two *Kelly* factors. *See id.* at 185-86. As for the third *Kelly* factor, appellant does not challenge whether Rogers properly applied the technique on the occasion in question and, thus, we do not consider it here. We conclude the trial court did not err in overruling appellant's objection based on reliability. *See Holmes,* 135 S.W.3d at 189.

Therefore, the trial court did not abuse its discretion in admitting the expert testimony of Rogers. *See Sexton*, 93 S.W.3d at 99. We overrule appellant's first issue.

## B.      Motion to Suppress

In his second issue, appellant argues the trial court erred in denying his pretrial motion to suppress as to the search of the hotel room. Specifically, appellant filed motions to suppress in the evading arrest/detention by a motor vehicle case, the Staffieri aggravated robbery case, and the Malcomb aggravated robbery case, seeking to suppress evidence obtained during the search of appellant's rooms at the Deluxe Inn.

### 1.      Standard of Review

No search warrant shall issue for any purpose unless sufficient facts are first presented to satisfy the issuing magistrate that probable cause does in fact exist for its issuance. TEX. CODE CRIM. PROC. ANN. art. 18.01(b). Probable cause sufficient to support a search warrant exists if the facts contained in the four corners of the affidavit and the reasonable inferences drawn therefrom justify the magistrate's conclusion that the object of the search is probably on the premises at the time of issuance. *Nichols v. State*, 877 S.W.2d 494, 498 (Tex. App.–Fort Worth 1994, pet ref'd). The magistrate may interpret the probable cause affidavit in a non-technical, common-sense manner and may draw reasonable inferences from it. *See Illinois v. Gates*, 462 U.S. 213, 235-38 (1983). We give deference to the magistrate's determination of probable cause and, considering the totality of the circumstances, evaluate whether the magistrate had a substantial basis for concluding probable cause existed to support the issuance of the warrant when viewing the affidavit. *See id.*

11

*2.      Adequacy of the Affidavits*

Here, search warrants were issued for rooms 118 and 119 at the Deluxe Inn. The pertinent portions of the affidavits in support of the warrants for each room stated as follows:

> On August 13, 2010, Detective Hale contacted forensics technician J. Rogers to check and see if any fingerprints had been found at the scene and Mr. Rogers advised that there was a very good right thumb print found at the scene and it was placed on the AFIS system.

> On August 13, 2010, forensics technician J. Rogers called Detective Hale and advised that he had received a positive identification on the right thumb print from AFIS that he had submitted. Mr. Rogers advised that the fingerprint belonged to Ronald Wayne Lightner, black male, 3/11/1962 and he matched the description of the suspect given by the complainant and witnesses.

Appellant contends the affidavits did not provide the requisite probable cause, because the affidavit attached to the search warrant did not "say why or how the 'AFIS' system identified appellant as a suspect." During the hearing on appellant's motions to suppress, appellant's trial counsel argued:

> And we feel the statements in here are inadequate to actually present probable cause to a magistrate.  It doesn't explain what AFIS is, doesn't explain all the process that this man just testified to. It's just that conclusory statement.  And we feel that that's insufficient probable cause within the four corners of the affidavit to warrant the search pursuant to the warrant.

Following argument by the State, appellant's counsel clarified he was only attacking the "insufficient information given in the affidavit about the, quote, AFIS identification" because AFIS was not explained in the affidavit.

However, this court has already determined that the use of an acronym in an affidavit may be proper. *See Gravitt v. State*, No. 05-10-01195-CR, 2011 WL 5178337, at *3 n. 1 (Tex. App.–Dallas Nov. 2, 2011, no pet.) (not designated for publication) (concluding the affidavit was not deficient even when it did not explain the acronyms, and  it was well-known that they stood for the National Crime Information Center (NCIC) and Texas Crime Information Center

12

(TCIC)).  Furthermore, our review of Texas case law demonstrates it is well-known throughout this state that AFIS is a fingerprint database, whose letters stand for the Automated Fingerprint Identification System.  *See, e.g., Ex Parte Miles*, 359 S.W.3d 647, 654 (Tex. Crim. App. 2012); *McCreary v. State*, No. 01-10-01035-CR, 2012 WL 1753005, at *2 (Tex. App.–Houston [1st Dist.] May 17, 2012, no pet.) (not designated for publication); *Dawkins v. State*, No. 08-09-00217-CR, 2011 WL 1312285, at *2 (Tex. App.–El Paso Apr. 6, 2011, no pet.) (not designated for publication); *Wilson v. State*, No. 02-09-00039-CR, 2010 WL 4261872, at *3 (Tex. App.–Fort Worth Oct. 28, 2010, no pet.) (not designated for publication); *Perez v. State*, No. 03-09-00618-CR, 2010 WL 4137443, at *1 (Tex. App.–Austin Oct. 21, 2010, no pet.) (not designated for publication).

Due to this common knowledge, we conclude the magistrate could have reasonably inferred that AFIS, as used in the affidavits, referred to the Automated Fingerprint Identification System.  *See Gates*, 462 U.S. at 235-38.  Thus, probable cause sufficient to support a search warrant existed here, because the facts contained in the four corners of the affidavits and the reasonable inferences drawn therefrom justified the magistrate's conclusion that the object of the search was probably on the premises at the time of issuance.  *See Nichols*, 877 S.W.2d at 498. Considering the totality of the circumstances, therefore, we conclude the magistrate had a substantial basis for concluding probable cause existed to support the issuance of the warrant when viewing the affidavits.  *See Gates*, 462 U.S. at 235-38. We overrule appellant's second issue.

### C.      *Hearsay*

In his third and fourth issues, appellant argues the trial court erred in overruling his objection to the State's propounded questions asking for hearsay evidence.  In particular, appellant complains about two separate occasions in which the trial court overruled his hearsay objections to Detective Hale's testimony. Appellant contends that allowing the hearsay testimony over his objections denied him his right of confrontation as guaranteed by the United States Constitution and, consequently, denied him a fair trial.

"Hearsay" is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801 (d). The "matter asserted" includes any matter explicitly asserted, and any matter implied by a statement, if the probative value of the statement as offered flows from the declarant's belief as to the matter. TEX. R. EVID. 801 (c). An extrajudicial statement or writing which is offered for the purpose of showing *what* was said rather than for the *truth* of the matter stated therein does not constitute hearsay. *Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim. App. 1995) (emphasis in original).

1.     *Standard of Review*

We review a trial court's decision regarding the admissibility of evidence under an abuse of discretion standard. *Cameron v. State,* 241 S.W.3d 15, 19 (Tex. Crim. App.2007) (citing *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex. Crim. App.1991)). Because trial courts are in the best position to decide questions of admissibility, appellate courts uphold a trial court's admissibility decision when that decision is within the zone of reasonable disagreement. *Cameron,* 241 S.W.3d at 19; *Montgomery,* 810 S.W.2d at 391. An appellate court may not reverse a trial court's decision regarding the admissibility of evidence solely because the appellate court disagrees with the decision. *Cameron,* 241 S.W.3d at 19; *Montgomery,* 810 S.W.2d at 391.

2.     *First Exchange*

Appellant first complains about the following exchange:

Q. When did you first receive the case?

A. It would have been on the 12th, 11th or --12th, I believe, because it was kind of an important case that day.

Q. So right around the time of the offense?

A. Yes.

Q. What did you do when you first received the case?

14

A. I read the report to find out what the details were. And in the report it stated that there was –

[DEFENSE COUNSEL]: I'm going to object, Your Honor. He's testifying about a report that is not in evidence.

THE COURT: Overruled.

A. The report stated that a home invasion robbery had occurred on that date, on the 12th. And a black male had gone in and robbed these complainants at gunpoint with a black and silver handgun. There is also in the report stated that forensics had been called and took fingerprints.

[DEFENSE COUNSEL]: May it please the Court; I'm going to object on the basis of hearsay.

THE COURT: Overruled.

Having reviewed the testimony, we conclude it was not offered for the truth of the matter asserted–that a black male had robbed the complainants with a black and silver handgun and that fingerprints were taken from the scene. Instead, his testimony was offered to explain how Detective Hale began his investigation and why appellant became a suspect. Because the statement was offered for the purpose of showing *what* was said rather than for the *truth* of the matter stated therein, the objected-to testimony does not constitute hearsay. *See Dinkins*, 894 S.W.2d at 347; *see also Cormier v. State*, 955 S.W.2d 161, 162 (Tex. App.–Austin 1997, no pet.) (stating "[t]he extrajudicial statements were not offered to prove that appellant was a drug dealer but to explain why the drug task force chose to investigate him").

3.      *Second Exchange*

Appellant also complains about the following exchange:

Q.[PROSECUTOR]: What else did you find while searching the room?

A. I found some laptops and I found a cell phone that belonged to my particular complainant in the offense we're–

Q. Belonged to David Malcomb?

15

A. Yes.

Q. Sister Melissa's house?

A. Yes. I learned where the vehicle wrecked –

[DEFENSE COUNSEL]: I object to anything represented to hearsay.

THE COURT: Overruled.

Having reviewed this testimony, we conclude Detective Hale's statement, "I learned where the vehicle wrecked," does not constitute hearsay. From where he was cut-off in his testimony, his statement was not made by one "other than the declarant" as required under the hearsay rule. *See* TEX. R. EVID. 801 (d). Furthermore, Officer Person had testified, prior to Detective Hale's testimony, that appellant had been involved in a vehicle chase with police when appellant caused a major accident. Because this information was admitted without objection, any alleged error was harmless. *See Leday v. State*, 983 S.W.2d 713, 717 (Tex. Crim. App. 1998) (the improper admission of evidence does not constitute reversible error if the same facts are shown by other evidence which is not challenged).

We overrule appellant's third and fourth issues.

## D.    *Jury Argument*s

In his fifth issue, appellant argues the trial court erred in overruling his objection to the State's jury argument during the guilt/innocence stage of trial. Specifically, at trial, appellant objected to the State's proposal that the witnesses were scared.

In his seventh issue, appellant complains the trial court erred in overruling his objection to the State's jury argument during the punishment phase of trial. Specifically, appellant complains the State's argument called for a community desired result.

## 1.    *Standard of Review*

The standard of review for improper jury argument is abuse of discretion. *Powell v. State,* 63 S.W.3d 435, 438 (Tex. Crim. App. 2001). To be permissible, jury argument must fall within one of the following four general areas: (1) summation of the evidence, (2) reasonable

deductions from the evidence, (3) an answer to the argument of opposing counsel, or (4) a plea for law enforcement. *Guidry v. State,* 9 S.W.3d 133, 154 (Tex.1999).

In examining challenges to jury argument, this Court considers the remark in the context in which it appears. *Gaddis v. State,* 753 S.W.2d 396, 398 (Tex. Crim. App. 1988) (citing *Denison v. State,* 651 S.W.2d 754, (Tex. Crim. App. 1983); *Blassingame v. State,* 477 S.W.2d 600 (Tex. Crim. App. 1972)). Counsel is allowed wide latitude in drawing inferences from the evidence so long as the inferences drawn are reasonable, fair, legitimate, and offered in good faith. *Gaddis,* 753 S.W.2d at 398 (citing *Vaughn v. State,* 607 S.W.2d 914, (Tex. Crim. App. 1980); *Antwine v. State,* 572 S.W.2d 541 (Tex. Crim. App. 1978); *Wyatt v. State,* 566 S.W.2d 597 (Tex. Crim. App.1978); *Griffin v. State,* 554 S.W.2d 688 (Tex. Crim. App. 1977)).

2.      *Guilt/Innocence Phase*

Appellant complains of the following portion of the State's argument during the guilt/innocence phase of trial:

> You are the judges of the credibility, and I ask that you find all of them credible. Whether they were nervous, scared, it's up to you. But I propose that they were all scared. They didn't want to come down here and testify, but they understand how important this is. This is happening in your community, ladies and gentlemen.
>
> [DEFENSE COUNSEL]: Your Honor, I'm going to object what she proposes. If the evidence shows that, if the jury determines that, but the prosecutor's perception of things is not a permissible argument.
>
> THE COURT: Overruled.

Thus, appellant objected to the State's proposal that the witnesses were scared. Examined in context, the State deduced the complainant witnesses were scared to testify. The record before us shows that both Staffieri and Malcomb testified they were nervous. Therefore, we conclude it was a reasonable deduction from the evidence for the State to argue that the complainants, including Staffieri and Malcomb, were scared, especially in light of the evidence that they were testifying against the person who had robbed them while using a deadly weapon. *See Gaddis,*

17

753 S.W.2d at 398. The trial court did not abuse its discretion. *See Powell,* 63 S.W.3d at 438. We overrule appellant's fifth issue.

*3.     Punishment Phase*

Appellant complains of the following portion of the State's argument during the punishment phase of trial:

> Ladies and gentlemen, right now you are they. It is up to you; it is up to you to decide what the headline reads. What is the proper punishment for this defendant? What will really make a difference to him? The 45 years meant nothing, right? What will really make a difference? What will make a statement? Think about next week when y'all go back to work. Your colleagues will ask you, Where you-guys been for the last week? You will say, Well, I was on this jury, and I heard this case. This man robbed five people. He had done it before; he would do it again. He got these big sentences. Nothing happened. What do you think they're going to ask next? What kind of punishment did you give this guy? What do you want to tell them?
>
> [DEFENSE COUNSEL]: I'll object, Your Honor. This is calling for a community-desired result, which is improper. It's outside the proper scope of jury argument.
>
> THE COURT: Overruled.
>
> [PROSECUTOR]: What do you want to tell the community that crimes like this are worth? Do you want to tell your colleagues, We showed him mercy. . . .

Jury argument by a prosecuting attorney that is designed to induce the jury to convict the defendant or assess him a particular punishment because "the people" desire such is improper jury argument. *Cortez v. State*, 683 S.W.2d 419, 420-21 (Tex. Crim. App. 1984). However, not every reference to the community made in closing argument by a prosecutor constitutes an improper appeal to community desires. *Goff v. State*, 794 S.W.2d 126, 127 (Tex. App.–Austin 1990, pet. ref'd.). For example, if the prosecutor urges the jury to be the "voice" of community, rather than asking the jury to lend an ear to community, the argument constitutes a proper plea for law enforcement. *See Harris v. State,* 122 S.W.3d 871, 888 (Tex. App.–Fort Worth 2003, pet. ref'd). We conclude the prosecutor's argument here is such a plea, and the trial court did not abuse its discretion. *See Powell,* 63 S.W.3d at 438. We overrule appellant's seventh issue.

18

*E.* *State's Cross-Examination*

In his sixth issue, appellant complains the trial court erred in overruling his objection to the State's cross-examination of his punishment phase witness. Specifically, appellant complains that questioning appellant's sister "about when [appellant] was released from prison intentionally injected the 'parole process' before the jury where this topic is not a proper subject for the jury to use in deliberation." Therefore, appellant complains he was denied a fair trial.

Under Texas law, parole is not a proper topic for jury deliberation. *Colburn v. State*, 966 S.W.2d 511, 519 (Tex. Crim. App. 1998). The introduction of evidence on the operation of parole and good conduct laws is prohibited. TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(d). Not every mention of parole, however, warrants a drastic remedy. *See Colburn*, 966 S.W.2d at 519-20 (citing *Sneed v. State,* 670 S.W.2d 262 (Tex. Crim. App. 1984) (for jury discussion of parole to be reversible error, appellant must show there was (1) misstatement of law; (2) asserted as fact, (3) by one professing to know the law; (4) relied upon by other jurors, and (5) who for that reason changed their vote to a harsher punishment)).

In the instant case, appellant complains of the following exchange during the State's cross-examination of his sister:

Q. So you didn't know that the defendant has been convicted of aggravated robbery in the past, back in the Eighties?

A. No.

Q. You weren't aware that he was in prison serving time for an aggravated robbery charge?

A. I was aware he was in prison, but I didn't know the actual details.

Q. So you didn't know why he was in prison?

A. Right.

Q. So you also weren't aware of the burglary cases that he had committed in the past either?

A. No.

19

Q. So when I read those off, that was the first you had ever heard of that, as well?

A. Yes.

Q. Did you know that he had ever been in trouble with the law before?

A. Yes.

Q. Just because you knew he was in prison, right?

A. Right.

Q. And he was in prison, in fact, until January of last year, right?

A. Yes, I believe. I'm not sure exactly the date. I believe so.

[DEFENSE COUNSEL]: Your Honor, we are going to object to any indication that might discuss the process of parole or anything like that that might be implied.

[PROSECUTOR]: Judge, this is the defendant's sister. I'm asking if she is aware when he was released from prison.

THE COURT: The question will be allowed. Objection is overruled.

Contrary to appellant's assertion, our review of the evidence shows appellant, not the State, injected the concept of parole before the jury. The State's questioning did not seek the mode of appellant's release from prison, whether by parole or satisfaction of his sentence, but for the date he was released from prison. Because the State did not introduce evidence regarding the operation of parole, we conclude the trial court did not err. See TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(d); *See Colburn*, 966 S.W.2d at 519-20. We overrule appellant's sixth issue.

## CONCLUSION

Having overruled all of appellant's issues, we affirm the judgments of the trial court.

/David L. Bridges/

DAVID L. BRIDGES
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

111659F.U05

21



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

LIGHTNER, RONALD WAYNE, Appellant

No. 05-11-01659-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 195th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F10-11165-N.
Opinion delivered by Justice Bridges.
Justices O'Neill and Murphy participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 30th day of April, 2013.

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE

22



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

LIGHTNER, RONALD WAYNE, Appellant

No. 05-11-01660-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 195th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F10-11166-N.
Opinion delivered by Justice Bridges.
Justices O'Neill and Murphy participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 30th day of April, 2013.

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

LIGHTNER, RONALD WAYNE, Appellant

No. 05-11-01661-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 195th Judicial District Court, Dallas County, Texas
Trial Court Cause No. F10-25163-N.
Opinion delivered by Justice Bridges.
Justices O'Neill and Murphy participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 30th day of April, 2013.

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE

24



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

LIGHTNER, RONALD WAYNE, Appellant

No. 05-11-01662-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the 195th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F10-59447-N.
Opinion delivered by Justice Bridges.
Justices O'Neill and Murphy participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered this 30th day of April, 2013.


/David L. Bridges/
DAVID L. BRIDGES
JUSTICE